UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID BERRY,<br><br>Defendant. | Case No. 25-CR-000142 (TSC) |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On May 4, 2025, while unconscious in the driver's seat of a running car, defendant David Berry illegally possessed a loaded firearm and an additional fully loaded fifteen-round extended magazine. Despite his three prior felony convictions for illegally possessing firearms and his knowledge that it was illegal for him to possess a firearm; the defendant went out into the community with a loaded gun. The defendant then disregarded this Court's orders over a dozen times while on release in this case, resulting in his detention in January 2026.

The defendant has accepted responsibility and is now before the Court to be sentenced for his unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). For the following reasons, the government respectfully requests that the Court impose a sentence of **37 months of imprisonment**, to be followed by three years of supervised release.

I.   **FACTUAL BACKGROUND**

On Tuesday, May 6, 2025, just before 6:00 a.m., Metropolitan Police Department ("MPD") officers Robel Petros and Charles Weems were dispatched to investigate an individual slumped over the wheel of a vehicle at the intersection of Massachusetts Avenue NW and H Street NW, Washington, D.C. When they arrived, Officers Petros and Weems found the vehicle stopped in a crosswalk, obstructing at least one lane of traffic. The defendant was in the driver's seat,

unconscious, with his foot on the brake. Keys were in the ignition, and the vehicle was in drive. According to a witness on scene, the defendant's car had been stopped in the crosswalk for about half an hour.



*Screenshot from MPD officer Petros's Body Worn Camera ("BWC")
showing the Defendant's vehicle.*

Officers turned the vehicle off and attempted to rouse the defendant, first by knocking on the windows and then by tapping him and performing a sternum rub. When the defendant woke up, officers asked him to step out of the vehicle. The defendant seemed to have trouble following this instruction and appeared to officers to be under the influence of an unknown substance.



*Screenshot from MPD Officer Weems's BWC showing the Defendant unconscious in the vehicle*

Ultimately, Officer Petros helped the defendant out of the vehicle. As the defendant stood up and adjusted his pants, a firearm fell to the ground in front of the defendant. A civilian witness standing nearby yelled "firearm, firearm" as the gun fell to the ground. The gun falling from the defendant's body to the ground is clearly captured on Officer Weems's BWC.





*Screenshots from MPD Officer Weems's BWC showing the Defendant and firearm after being dropped*

The firearm was a 10mm Glock 29 (serial number BWKB046) loaded with 1 round in the chamber and 7 rounds in a 10-round capacity magazine.



*Picture of the Firearm, Ammunition, and the Magazine*

After the loaded firearm fell from the defendant and while it was lying unsecured in the street, the defendant resisted officers and appeared to take a step towards the firearm. It took two

4

MPD officers and a Special Police Officer ("SPO"), who was standing on the sidewalk when the firearm fell to the ground, to restrain and handcuff the defendant. After placing the defendant in handcuffs, Officer Weems searched the defendant and recovered an extra, fully loaded fifteen-round capacity magazine from the defendant's left front pants pocket. The additional magazine was loaded with 10mm ammunition, consistent with the firearm the defendant dropped on scene.



*Picture of the Additional Ammunition and Magazine*

The defendant is prohibited from possessing a firearm under both Federal and District of Columbia law because he has been convicted previously of crimes punishable by more than one year of imprisonment. Despite that prohibition, the defendant possessed a 10mm handgun loaded with 1 round in the chamber, 7 rounds in the magazine. He also had 15 rounds of 10mm ammunition in an extra magazine in his pocket.

II.     **PROCEDURAL HISTORY**

The defendant was arrested immediately after MPD officers discovered the firearm. On May 7, 2025, the United States charged the Defendant by criminal complaint in the Superior Court of the District of Columbia with 22 D.C. Code § 4503(a)(1) (unlawful possession of a firearm by

a person convicted of a crime punishable by imprisonment exceeding one year) and 22 D.C. Code § 4504(a)(1) (carrying a pistol without a license [outside home or place of business]).

On May 9, 2025, the defendant waived his preliminary hearing. After hearing arguments from both parties, Magistrate Judge Gerald Fisher determined that given the nature and circumstances of the offense, the defendant's convictions for firearm-related offenses, and the weight of the evidence, the defendant would pose a danger to the community if he were release from custody and that no condition or combination of conditions of release would reasonably assure the safety of any other person in the community.[1]

On May 15, 2025, a federal grand jury returned a one count indictment against the defendant, charging him with unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1). On May 19, 2025, at the defendant's initial appearance, the government moved for the defendant to be detained pending trial. On May 22, 2025, Magistrate Judge Sharbaugh released the defendant. (ECF No. 9). The government filed an emergency motion to review the release decision that day. (ECF No. 8). On May 27, 2025, this Court heard argument on the government's detention appeal and affirmed the magistrate's release order.

On July 15, 2025, the Pretrial Services Agency ("PSA") filed a pretrial violation report, noting that the defendant tested positive for marijuana and synthetic cannabinoids. (ECF No. 22). On July 16, 2025, the government filed a motion to revoke the defendant's release based on this violation. (ECF No. 24). The Court denied that motion. (Minute Order 7/16/2025).

On August 12, 2025, PSA filed a second pretrial violation report, noting that the defendant was continuing to test positive for marijuana and was not maintaining contact with PSA. (ECF No. 27). On August 22, 2025, October 20, 2025, and November 12, 2025, PSA filed reports, stating

---

[1] This case was dismissed after the defendant was charged in the instant case.

that the defendant was in compliance with his conditions of release. (ECF Nos. 29, 32, and 33).

On October 27, 2025, the parties represented to the Court that they could not reach an agreement, and the Court scheduled a jury trial for January 12, 2026. (Minute Order 10/27/2025). On November 13, 2025, the defendant pled guilty to the Indictment. (ECF No. 35). The government moved to detain the defendant pending sentencing under 18 U.S.C. § 3143. The Court denied that motion, and scheduled sentencing for March 6, 2026. (Minute Entry 11/13/2025).

On December 8, 2025, PSA filed a violation report, stating that while the defendant was on home incarceration and could not leave his home, the defendant left and didn't return to the home until the early hours of the morning on *eight* separate occasions. (ECF No. 36). Additionally, the defendant was testing positive again for marijuana. (ECF No. 36). The Court promptly scheduled a hearing on whether to revoke the defendant's release pending sentencing.

On December 16, 2025, the government renewed its motion to detain the defendant pending sentencing. The Court decided to give the defendant two weeks to regain compliance and scheduled a continued violation hearing for December 30, 2025. At that hearing, the Court noted that the defendant had maintained for two weeks and ordered the defendant released pending sentencing, over the government's objection. (Minute Entry 12/30/2025).

On January 8, 2026, PSA filed another violation report, stating that the defendant's mother had removed the defendant from the residence and would not allow him to return. (ECF No. 38). The report stated that in addition to leaving the home and returning in the early hours of the morning on two separate occasions, the defendant repeatedly defied his mother's orders not to have an unidentified female in the house. (ECF No. 38). After finally agreeing to leave, this woman broke Ms. Berry's screen door. (ECF No. 38). The Court promptly issued a bench warrant.

On January 16, 2026, the defendant appeared in Court for a new revocation hearing. The

Court found that the defendant had repeatedly violated the Court's conditions and ordered the defendant detained pending sentencing. (Minute Order 1/16/2025).

The Court ordered the sentencing hearing be held on March 6, 2026, at 10:00 am.

### III. LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    (B) to afford adequate deterrence to criminal conduct;
>    (C) to protect the public from further crimes of the defendant; and
>    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>       (i) issued by the Sentencing Commission . . .; and
>       (ii) that, . . . are in effect on the date the defendant is sentenced; . . .

> (5) any pertinent policy statement –
> > (A) issued by the Sentencing Commission . . . and
> > (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.* at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

### IV.   SENTENCING GUIDELINES CALCULATION

#### A. The Defendant's Final Offense Level is 17.

The base offense level for the defendant is 20 under U.S.S.G. §2K2.1(a)(4)(A), because, as discussed more fully below, he possessed the firearm in this case after sustaining one felony conviction for a controlled substance offense. Accordingly, the defendant's Final Offense Level is 17 after considering his acceptance of responsibility in this matter. *See* U.S.S.G. § 3E1.1.

### B. The Defendant's Criminal History Category is III, and His Guideline Range Is Thus 30 to 37 Months' Imprisonment.

The government concurs with Probation's assessment of the defendant's criminal history as set forth in the Draft Presentence Investigation Report (PSR) at pages 8-20. As reflected in the Draft PSR and in the table on the next page, the total criminal history score for the defendant is five (5), establishing a Criminal History Category of III.

With a Criminal History Category of III and a Final Offense Level of 17, the defendant's Guideline range is 30 to 37 months' imprisonment.

| Docket | Charge | Sentencing Date | Sentence | Points |
|---|---|---|---|---|
| DCSC 2017 CF2 13232 | Carrying a Pistol without a License (CPWL) | 7/24/2019 (Arrest 8/2/2017) | Youth Reform Act (YRA) 6 months incarceration, 6 months suspended. | 1 (4A1.1(c)) |
| DCSC 2021 CF2 249 | PWID (Cocaine), FIP | 8/24/21 (Arrest 1/7/2021) | 16 months, all but 12 months suspended; 12 months incarceration (concurrent) | 2 (4A1.1(b)) |
| DCSC 2022 CF2 4786 | CPWL | 3/9/2023 (Arrest 8/17/2022) | 97 days incarceration (time served) | 2 (4A1.1(b)) |

## V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A. The Nature and Circumstances of the Offense

The defendant pled guilty to illegally possessing a loaded firearm and an additional loaded magazine. While this offense is possessory in nature, this Court has warned against discounting the inherent danger associated with loaded firearms. "Illegally possessing a fully loaded concealed

10

firearm with easy, quick access in the front waistband of defendant's pants, while out in public, poses an inherent risk of danger to the community." *Blackson*, No. 23-cr-25, 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). This is particularly the case because the firearm was fully loaded and ready to fire. *See United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (finding that a defendant should be detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling.") And Congress recently indicated how seriously these offenses should be taken when it increased maximum sentences for 18 U.S.C. 922(g) from 10 years to 15 years.

Further, arguments concerning "mere possession" ignore the scourge of gun violence in our community. A loaded firearm is a deadly weapon. It has the ability with a single pull of the action to end a life. A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter. And the reason law enforcement targets the possession of firearms prior to the commission of a crime is because once an individual makes the decision to produce a firearm and pull the trigger, law enforcement is powerless to intervene.

The circumstances of the instant offense are particularly concerning, as the defendant possessed this loaded firearm while passed out in the driver's seat of running vehicle. Only upon police conducting a sternum rub on the defendant did he wake up. Upon waking up, the defendant was unable to comply with police commands for several minutes, as he appeared to be under the influence of an unknown substance. Police repeatedly tried to talk to him while he was awake, and the defendant was unable to communicate with the officers. The amplified potential for tragedy present in this case is unique because the defendant was likely intoxicated while both driving a vehicle and possessing a loaded firearm. The defendant posed a significant danger to all civilians

11

and law enforcement in the area, as this was the beginning of morning rush hour, in a mixed use urban area with restaurants, apartments, and stores. Accordingly, the nature and circumstances of the offense require a lengthy sentence of incarceration.

### B. The History and Characteristics of the Defendant

The defendant's history and characteristics warrant a top of the guidelines sentence, as he has repeatedly violated firearms laws with utter disregard to the law. In August 2017, the defendant was charged in D.C. Superior Court, case number 2017-CF2-013232 with Carrying a Pistol Without a License ("CPWL") in violation of 22 D.C. Code § 4504(a)(1). There, MPD officers recognized the defendant as having an outstanding arrest warrant for possession of an unregistered firearm, unregistered ammunition, and large capacity feeding device. Upon arresting the defendant, MPD officers found the defendant to have within his compression shorts a Colt .45 Commander pistol loaded with one round in the chamber and several rounds in the magazine, which had a capacity of more than 10 rounds. The Colt .45 also was reported stolen out of Richmond County, Georgia. The defendant pled guilty and was sentenced on July 24, 2019, to a suspended 6-month term of imprisonment and 18 months' supervised probation.

The defendant's probation in 2017-CF2-013232 was terminated unsatisfactorily because in January 2021, the Defendant was rearrested and charged in D.C. Superior Court Case No. 2021-CF2-000249 with Unlawful Possession With Intent to Distribute a Controlled Substance (Cocaine) While Armed ("PWIDWA") in violation of 48 D.C. Code § 904.01(a)(1) and 22 D.C. Code § 4502. Specifically, MPD officers observed an unidentified individual standing outside of a vehicle engaged in what appeared to be a hand-to-hand drug transaction with two subjects inside the vehicle, one of whom was the defendant sitting in the rear right passenger seat. As MPD officers approached, the defendant leaned over towards the left portion of the back seat and appeared to be

12

frantically manipulating something in the left rear-seat area with both hands. MPD officers observed two pistols in the rear right passenger's map-pocket, which were inches from the defendant's hands. The first gun – a 9mm Ghost Gun – was loaded with 1 round in the chamber and 17 rounds in a 30-round capacity magazine. The second gun – a 9mm Springfield Armory handgun – was loaded with 1 round in the chamber and 12 rounds in a 13-round capacity magazine.

Beyond finding those two pistols, a third pistol was recovered on the floor under the front passenger seat. This third gun – a 9mm Beretta – was loaded with 1 round in the chamber and 7 rounds in the magazine. This gun was reported stolen out of Lamar County, Mississippi.

MPD officers also recovered the following from the back seat area where defendant Berry was observed manipulating something: (1) approximately 37 grams of a white powdery substance that was suspected amphetamines; (2) approximately 27 grams of a white powdery substance that was suspect fentanyl; and (3) 178 grams of plant material that was suspected synthetic cannabinoids. Moreover, MPD officers recovered approximately 6 grams of a white rock-like substance that was suspected cocaine base from the defendant's pants pocket, along with $660.00 in United States Currency. Finally, the defendant provided MPD officers with a false name; he told them that his name was David Byrd with a date of birth of October 22, 2021. However, when he was fingerprinted, MPD officers determined his real name is David Berry with a date of birth of November 4, 1997.

On April 21, 2021, the defendant plead guilty to Possession with Intent to Distribute (Cocaine) in violation of 48 D.C. Code § 904.01(a)(1) and Unlawful Possession of a Firearm (Prior Conviction) in violation of 22 D.C. Code § 4503(a). The defendant admitted to possessing $660 and the aforementioned cocaine, which he possessed with the intent to distribute. He also admitted to possessing two separate firearms while being a convicted felon—a 9mm Ghost Gun and a Black

13

Springfield Armory 9mm handgun. *See* Factual Proffer, Dkt. Entry dated April 21, 2021, in D.C. Superior Court Case No. 2021-CF2-000249. On August 21, 2021, the defendant was sentenced on the drug charge to 16 months' incarceration, execution suspended as to all but 12 months, with 1 year of supervised probation. He was also sentenced to a concurrent 12-month term of incarceration on the firearm charge. While on probation in 2021-CF2-000249, the defendant repeatedly tested positive for cocaine use and failed to participate in rehabilitative programing assigned by his probation officer. *See* Notice of Non-Compliance, Dkt. Entry date August 23, 2022, in D.C. Superior Court Case No. 2021-CF2-000249.

On August 17, 2022, while he was still on probation, the defendant was arrested and later charged with possessing another firearm, in D.C. Superior Court, Case No. 2022-CF2-004786. On October 19, 2022, in the same case, the defendant was indicted on the following charges: (1) PWIDA in violation of 48 D.C. Code § 904.01(a)(1) and 22 D.C. Code § 4502; (2) Possession of a Firearm During a Crime of Violence of Dangerous Offense in violation of 22 D.C. Code § 4504(b); (3) Unlawful Possession of a Firearm (Prior Conviction), in violation of 22 D.C. Code, § 4503(a)(1); (4) CPWL in violation of 22 D.C. Code § 4504(a)(1); (5) Possession of a Large Capacity Ammunition Feeding Device, in 7 D.C. Code, § 2506.01(b); (6) Possession of Unregistered Firearm, in violation of 7 D.C. Code, § 2502.01(a); and (7) Unlawful Possession of Ammunition, in violation of 7 D.C. Code, § 2506.01(a)(3). Specifically, the defendant was inside a tent where United States Park Police ("USPP") officers believed hand-to-hand drug transactions were occurring. After stopping the defendant, USPP officers found the defendant to be in possession of a 9mm Taurus Millennium handgun loaded with 1 round in the chamber and 10 rounds in the magazine, along with approximately 44 grams of fentanyl in his groin and $480 in small denominations of United States currency. The resale value of that fentanyl was

14

approximately $4,400. On December 20, 2022, the defendant plead guilty to CPWL and, on March 9, 2023, received a jail-only sentence in his third firearm conviction.

The defendant's history and characteristics demonstrate that he is unable to comply with the law and the Court's orders. As such, this factor weighs greatly in favor of a 37-month sentence.

### C. The Need for the Sentence Imposed

The defendant has rapidly accumulated firearms charges and convictions in his young life, yet the relatively lenient sentences imposed upon him by other courts have done little to deter his criminal and dangerous behavior. A sentence of 37 months would serve as a specific deterrent to the defendant, demonstrating to him that if he continues to violate the law, his penalties will increase in severity.

In considering what would constitute a sentence that complies with the 3553(a) factors, the Court should recognize the defendant's utter disregard for the Court's orders while on pretrial release. Despite repeated admonishments by this Court, the defendant demonstrated that he was incapable of following the Court's orders by repeatedly leaving his home until the early hours of the morning, testing positive for drugs, and disrespecting his mother and her rules in the home.

The day after the Court allowed the defendant to remain on release on December 30, 2025, and the defendant promised the Court that he would comply with the Court's conditions, did the defendant then violate the Court's orders again by leaving the house and returning home on January 1, 2026, at 4:55 am and then left again at 6:31 am. The defendant continued to flaunt the Court's orders by arriving at his mother's home on January 8, 2026, with an unidentified female at 5:00 am. The government will spare the salacious details presented in this violation, ECF No. 38, but will note that, despite the defendant's mother repeatedly telling the defendant that the

15

female needed to leave, the defendant refused. When the female did leave, she broke Ms. Berry's screen door.

This behavior, of going out into the early hours of the morning and testing positive for drugs, should be particularly concerning to the Court, as it is the same kind of behavior that precipitated the instant offense. The defendant has repeatedly told the Court that he would comply with the Court's orders, yet his actions demonstrate that he is either unwilling or unable to do so. As this defendant has repeatedly violated the Court's orders throughout the pendency of the case, a lengthy sentence would both serve as a specific deterrent and promote respect for the rule of law. A term of imprisonment of 37 months is, thus, sufficient but not greater than necessary to accomplish this goal.

### D. The Need to Avoid Unwarranted Sentencing Disparities

Although the government is recommending a sentence that is higher than both the median (30 months) and average (29 months) lengths of sentences of defendants within the same criminal history category and offense level for a 922(g)(1) offense, a sentence of 37 months would not result in unwarranted sentencing disparities due to the unique nature of the offense, the defendant's repeated firearms convictions, and the defendant's clear disrespect for the Court's orders and the rule of law.[2]

---

[2] United States Sentencing Commission, *Judiciary Sentencing Information (JSIN)*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited February 24, 2026) ("During the last five fiscal years (FY2020-2024), there were 1647 defendants whose primary guideline was §2K2.1, with a Final Offense Level of 17 and a Criminal History Category of III, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 1583 defendants (96%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 29 month(s) and the median length of imprisonment imposed was 30 month(s).")

## VI. CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court sentence Defendant Berry to a term of 37 months' imprisonment to be followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: /s/ *David B. Liss*
DAVID B. LISS
Assistant United States Attorney
D.C. Bar No. 90017629
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-680-4025
Email: David.liss2@usdoj.gov